## SHACKELFORD v. POOL, Clerk of Supreme Court.

No. 22255. Opinion Filed March 1, 1932.

Rehearing Denied March 29, 1932.

128

Suits & Disney, for petitioner.

J. Berry King, Atty. Gen., and S. H. Lattimore, Asst. Atty. Gen., for respondent.

RILEY, J. A peremptory writ of mandamus is sought in this original action, to compel Gus Pool, clerk of this court, to refund a balance of a deposit for cost in cause No. 17928, which is an action long since closed, the mandate in that case having issued in the year 1929.

The petitioner also seeks refunds, or an adjudication as a basis for refunds, for all former litigants similarly situated. The total amount involved runs into thousands of dollars.

The writ is denied. The reason for the denial follows:

The clerk holds no money subject to the payment of the claim presented, for the claim was not made within the time allowed by law. It is true that section 8613, C. O. S. 1921, vests in the clerk authority to withdraw funds from the state treasury, upon voucher, for refund of excessive collections, and authorizes said clerk thereby to make payments for legal claims and charges. However, the legality of such claims or charges and the refund of excessive collections are dependent upon an application therefor within time allowed by law.

The question as to whether this claim is legal or otherwise depends upon the facts and the law applicable thereto.

The facts stated in the petition are:

"That said sum * * * has remained uncalled for more than one year since closing of said cause."

The law applicable is contained in section 78, C. O. S. 1921:

"All moneys that shall remain unclaimed or uncalled for in the hands * * * of any * * * state officer or employee for the period of one year shall escheat to the state, and shall forthwith following the close of said

one year period be paid into the state treasury."

The inevitable conclusion under the facts and law is that this claim came too late, and that payment by the clerk was properly denied.

We shall consider further the effect of the escheat of the unclaimed balance on deposit with the clerk as provided by the statute last above cited.

"No inquest of office or other judicial proceedings is necessary" to escheat property the title to which fails for want of a proper claimant. 21 C. J. 853; State v. Stevenson (Idaho) 55 P. 886. But the title passes by operation of law without court proceedings or inquest in the nature of "office found" as provided by statute in such cases in this state. In re Apostolopolous' Estate (Utah) 250 P. 469; State v. Smith (Cal.) 12 P. 121. Unless claimant appears and demands the funds within the period fixed by statute, his rights to the property have ceased to exist. People v. Roch (Cal.) 18 P. 407; Estate of Pendergast (Cal.) 76 P. 962. If claimant fails to appear in said time and claim the funds, the same then vest in the state, not strictly by escheat, but by virtue of the effect of the statute. In other words, the claim is barred and claimant has lost his right to claim the refund. Estate of Miner (Cal.) 76 P. 768. See, also, Fuhrer v. State, 55 Ind. 150, wherein it is held that: "At the end of such period of time the property vests in the state by operation of law." Scott v. State (Ind.) 134 N. E. 219. Such is the rule in New York. In re Melrose Avenue, 234 N. Y. 48, 136 N. E. 235, 23 A. L. R. 1233.

The Supreme Court of the United States considered the type of escheats here involved and recognized with approval the statutes governing them, which in effect provide an escheat ipso facto, or, as that court said: "By mere operation of law." Hamilton v Brown, 161 U. S. 256, 40 L. Ed. 691.

We therefore hold that by virtue of section 78, supra, title to these unclaimed balances vested in the state immediately upon the expiration of a one-year period. By virtue of section 80, C. O. S. 1921, these funds vested in the state were apportioned and credited to the general revenue fund for the current year. Petitioner cannot rightfully claim that he has been deprived of property without due process of law as inhibited by the state and federal Constitutions (Const. Okla. art. 2, sec. 7, Const. U. S. Amend. 14), for he was in court and he knew, in that he was charged with knowledge of

the law, that when his case was finally closed, unless he asserted his right to refund of deposit for cost within a one-year period, his right thereto would be forever barred and such funds would become general revenue of the state.

Since title to the balance on deposit has long since become vested in the state, and since said item has long since been apportioned and has become a part of the general revenue fund of the year 1930, and thus has been expended, it is clear that the item sought to be recovered by this claim is beyond the control of the clerk, and it is now impossible, by law, for the clerk to perform the acts and duties demanded of him in this petition. It is axiomatic that the law will not require the impossible. Lex non cogit non impossibilia.

There is another and distinct reason for denial of the writ. This matter was long ago presented to this court by these attorneys, and the right of refund of this particular item was then denied by order of this court and recorded in the case of Georgianna Smith v. G. W. Hildebrandt, No. 17928. (Dismissed upon stipulation of parties. No opinion.) This former ruling is res adjudicata, and thus the issue now presented was foreclosed by the order then made.

The right to require the performance of the act is not clear (section 449), and peremptory writ as sought should be denied.

It is so ordered.

LESTER, C. J., and CULLISON, SWINDALL, ANDREWS, and McNEILL, JJ., concur. KORNEGAY, J., dissents. CLARK, V. C. J., and HEFNER, J., absent.

---

KORNEGAY, J. (dissenting). I am unable to agree with the views expressed in the majority opinion. If followed, the result would be an injustice to a litigant in this court, and worse than an injustice to the state of Oklahoma. The facts are practically not in dispute, as an inspection of the short record will show. Owing to the costs of printing, it is not deemed necessary to set out the application to the court for an order on its clerk to refund $7.75, balance left of a deposit made by plaintiff, James M. Shackelford, with the clerk, so as to have a fund in the clerk's hands to meet the fees of the clerk, and other officers of the court, as they might accrue in the progress of the litigation. The necessity for anything more than the signing of a check, by the clerk, on the depository where he carries his account, in favor of the plaintiff, for the amount involved, is not apparent from the record, as shown by the application for "mandamus," and the clerk's answer to the demand for the money, signed by him, the demand and reply being as follows:

"In the Supreme Court of the State of Oklahoma.

"Georgeanna Smith and Jas. M. Shackelford, Plaintiffs in Error, v. G. W. Hilderbrandt and John B. Jamison, Defendants in Error. No. 17928.

"Demand for Payment of Rebate of Costs.

"To Gus Pool, Clerk of the Supreme Court:

"Demand is hereby made that you pay the sum of $7.75 unexpended balance of court costs deposited with the Clerk of the Supreme Court in the above-entitled cause prior to March 26, 1927.

"Dated this 6th day of March, 1931.
"(Signed) James M. Shackelford,
"Plaintiff in Error and Attorney for Plaintiff in Error.
"By Suits & Disney.

"Service of above demand accepted this 9th day of March, 1931, and said demand is refused. relying on Session Laws 1919, chapter 287, H. B. 491.
"(Signed) Gus Pool
"Clerk of the Supreme Court."

The demand and the answer and notice of application are self-explanatory. The clerk's signature is original, and the reason for refusal is in manual writing. Copy of the notice of intended application for the order, omitting the caption, is as follows:

"To Gus Pool as Clerk of the Supreme Court of the State of Oklahoma:

"You are hereby notified that on the 24th day of April, 1931, or as soon thereafter as possible, I will apply to the Supreme Court of Oklahoma for writ of mandamus to issue against you, requiring you to pay to myself the sum of $7.75, rebate of unpaid costs in cause No. 17928 in the Supreme Court of the state of Oklahoma filed prior to March 26, 1927, and uncalled for more than one year.

"Dated this 14th day of April, 1931.
"James M. Shackelford,
"By Suits & Disney,
"His Attorneys of Record.

"I hereby acknowledge receipt and accept service of above and foregoing notice, this 14th day of April, 1931.
"Gus Pool,
"Clerk of the Supreme Court."

The petition for the order and verification thereof cover six closely typewritten pages, and therefore are not set out here.

The attorneys for plaintiff herein are offi-

cers of this court. The defendant, another officer of this court, appeared by the Attorney General of the state, also an officer of this court. The attorneys for plaintiff filed a brief. The Attorney General, on behalf of the clerk, filed a brief. The attorneys for the plaintiff filed a reply brief. On these the case was submitted to this court for decision.

The plaintiff contended that the fund was a trust fund in its inception and belonged to him and he was entitled to the same. He specially set up provisions of the state Constitution, and also the federal Constitution. The Fifth Amendment to the federal Constitution, and section 1 of the Fourteenth Amendment thereto were specially relied on, and section 7 of article 2 of the state Constitution was also specially relied on. The allegations of fact in the application were not controverted. The sole reliance for refusal to return the deposit was the existence of a state statute passed in 1919 (ch. 287, S. L. 1919), which with its title is as follows:

"An Act providing for the disposition of certain unclaimed money; requiring state officers and employees to pay into the State Treasury monthly all moneys received from miscellaneous sources, and declaring an emergency.

"Be it Enacted by the People of the State of Oklahoma:

"Unclaimed Moneys to Escheat:

"Section 1. All moneys that may remain unclaimed or uncalled for in the hands of the State Commissioner of Highways, or of any other state officer or employee for a period of one year shall escheat to the state and shall forthwith following the close of said one year period, be paid into the State Treasury.

"Moneys to Be Covered Into Treasury.

"Section 2. Except as otherwise specifically provided by law, all fees, proceeds of sale of state property and public charges of all character whatsoever, received by any state officer or employee shall be paid monthly into the State Treasury.

"Apportionment of Moneys.

"Section 3. All moneys that may come into the State Treasury, pursuant to the provisions of this act, together with all amounts (sic) that may be received by the State Treasurer as interest on average daily bank balances shall be apportioned and credited to the general revenue fund for the current year: Provided that the provisions hereof shall not apply to interest received on deposits from funds under the control of the Commissioners of the Land Office.

"Emergency.

"Section 4. It being immediately necessary for the preservation of the public peace, health and safety, an emergency is hereby declared to exist by reason whereof this act shall take effect and be in full force from and after its passage and approval.

"Approved March 29, 1919."

It is very evident that neither the title nor the act shows a legislative purpose of providing that funds held in trust by court clerks, belonging to private individuals, should belong to the state if unclaimed or uncalled for during one year. Most clearly the clerk of this court would know by a simple reference to his books when he would no longer require the maintenance of a deposit by a litigant to enable him to perform his duties as clerk, and simultaneously deduct the allowable fees. Being a trust fund, most clearly the clerk would have a duty to perform by the "cestui que trust," the depositor, viz., to return the deposit as soon as he had no further use for it. To hold that it was the duty of the beneficiary to watch the docket and collect at once or within twelve months any rebates, calls for a system of espionage inconsistent with the confidence that should exist between a litigant and court and court officials, to whom he must appeal for redress of wrongs done him, in whose custody by law and court order he must place funds to enable the court's officials to function. The statute is practically 13 years old. It has required practically a decade and more to discover this source of revenue for the state. Financial depression should not change the rules of statutory construction.

Most clearly, the act covers only such funds as those held by the Commissioner of Highways, viz., funds belonging to the state or some subdivision or held for its use and benefit, that had not been used, though designated for use. Evidently the principle announced in section 55 of article 5 of the state Constitution was in the mind of the Legislature as follows:

"Sec. 55. No money paid out except by appropriation. No money shall ever be paid out of the treasury of this state, nor any of its funds, nor any of the funds under its management, except in pursuance of an appropriation by law, nor unless such payments be made within two and one-half years after the passage of such appropriation act, and every such law making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated and the object to which it is to be applied, and it shall not

be sufficient for such law to refer to any other law to fix such sum."

Section 57 of the same article is as follows:

"Sec. 57. Acts to Embrace One Subject —Amendments. Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title, except general appropriation bills, general revenue bills, and bills adopting a code, digest, or revision of statutes; and no law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only; but so much thereof as is revived, amended, extended, or conferred shall be re-enacted and published at length: Provided, That if any subject be embraced in any act contrary to the provisions of this section, such act shall be void only as to so much of the law as may not be expressed in the title thereof."

It could scarcely be argued with plausibility that the title to the act is sufficient to cover an enactment that unclaimed trust funds, held for a litigant by the clerk of any court, shall belong to the state if uncalled for within one year. The English language appears to be sufficiently broad that such an idea could have been expressed in plain words, of few syllables, or compound words of many syllables. The body of the act does not so provide. It is related of an ancient ruler, who was required to publish the laws enacted before they became effective, that he complied with the requirement by posting copies, so high, however, that no one could see to read them. He evidently satisfied his conscience, but his subjects were certainly not "well advised."

The briefs do not discuss these questions, but they are here for answer, as without this act the long delayed question would never have been mooted. The contention made by the Attorney General is that the fund, by reason of its owners, though ignorant as to whether further required by his trustee, failing to call for it for a space of one year, becomes the property of the state by "escheat." He cites a lot of cases to establish that "office found" or "inquest" was not necessary, and that the statute declaring was all that was necessary. An inspection of Words & Phrases, Second Series, vol. 3, page 702, under title "Office Found," would be instructive. The cases cited by the Attorney General were all "dead claims," i. e., the owner was called by his Creator to surrender life, and property dominion, by the inevitable law of death, leaving no one else to succeed except the state. The same condition exists with reference to the authorities relied on to support the position of the majority of this court.

Evidently, it would be well to find out what the word "escheat" means, as defined in the dictionary. When this is done, we are in a position to understand the possible meaning, and the probable meaning of the Legislature in passing the act quoted above. When we get along the route as to what was probably meant, we can refer to "cases" to ascertain whether the law, as interpreted and applied, would violate the letter or the spirit of the Constitution. Here, in short, the clerk of this court admits he still has the money, and for fear the state's contention, as made by its Attorney General, may embarrass him if he pays to the representative of the one depositing, viz., an attorney licensed to practice law in this court, he has asked for a definition by this court of his duty. "Escheat" is defined by Webster's International Dictionary, as follows:

"Law. 1. In the English feudal law, the falling back or reversion of lands to the lord of the fee upon the failure of heirs capable of inheriting under the original grant. This failure of heirs may result from the actual death of the tenant leaving no competent heirs, or from his legal death and the extinction of the blood by attainder. In Medieval French law, land was said to descend to lineal heirs and escheat to collateral heirs; and originally in English law escheat was used interchangeably with reversion for the falling of lands to the lord upon failure of heirs to a tenant in fee simple, or failure of heirs of his body to a tenant in tail; but later, after subinfeudation was prohibited and the nature of the estate tail fixed (in the time of Edward I) escheat was applied only in case of the tenant in fee simple, and reversion in case of the tenant in tail. Escheat consequent upon attainder of blood is distinguished from forfeiture, which also was formerly consequent upon treason or felony. This escheat was abolished in England by the Felony Act of 1870.

"2. Hence, the lapsing or reverting of land to the crown, or to the state in the United States, as original and ultimate proprietor, by reason of a failure of persons legally entitled to hold the same.

"3. A writ, now abolished, to recover escheats from the person in possession.

"4. In Scotland, sometimes, any confiscation or forfeiture, called simple escheat when absolute, and liferent escheat when only of the profit accruing during the person's life.

"5. Property falling to the lord, king, or state, by escheat; also, the right of taking property by escheat.

"6. Confiscation or plunder; pl. booty or spoil. Obs."

"Escheat (verb): Law. To revert, fall, lapse, or pass by escheat."

As applied to the facts here admitted, the claimant is alive, at least his death has not been suggested, and reputable lawyers appear for him. Therefore the decisions relied on by the Attorney General and the majority are not yet applicable. When a case is reached of a dead person owning property with no heirs, or a case of alien land ownership, or aliens being the heirs, no doubt the cases relied on would be instructive. For practical purposes in this case, the cases cited by the plaintiff dealing with legislation, concerning unclaimed bank deposits and funds deposited in court, are not only instructive, but highly persuasive that the Legislature never intended, in the act relied on, to provide for the disposition of that class of funds. They are further highly persuasive that if the interpretation contended for by the Attorney General and placed by the majority of this court upon the act, viz., a transfer irrevocably to the state of all such funds, it would violate the "Ten Commandments," as well as a natural sense of justice, previous decisions of this court, the fundamental law of this state, the Constitution of the United States, and the provisions specially relied on by the petitioner requiring "equal protection" and "due process of law."

By reference to the act, it will be seen that if applied to deposits to cover costs, it also applied to every other species of deposits made in court, whether in common-law matters, chancery funds, or estates administered. It is further apparent that all such funds, so far as the rightful owner is concerned, would be "sunk without trace." Such an interpretation, it seems to me, is unthinkable. I cannot believe that the Legislature in passing the law brought forth such a monstrosity.

The money, under the majority view, goes to the general fund of the state. If the statement contained in the majority opinion is correct, viz., that it was covered into the general fund of 1930 and used by the state, the state should show its sense of fair play as soon as possible by reimbursing the $7.75 as having been confiscated. The Attorney General in his brief, however, does not so claim. Neither does the clerk, or the attorneys for the claimant. Res adjudicata is neither pleaded nor suggested by the litigants.

There are two decisions, of which I am aware, that hold the act would be unconstitutional because of the funds going into the general fund instead of the school fund. One is from this court, Parwal Investment Co. v. State, 71 Okla. 121, 175 P. 514. That was an attempt by the state to get a judgment for a forfeiture, by proceedings as in case of escheat, of some land in Mayes county, transferred to the corporation in plain violation of the Constitution and statutes of this state. The legislative act required the net proceeds to be placed in the county school fund instead of the school fund of the state. This court held the act unconstitutional, expressing the hope that a future act would be passed vitalizing the Constitution. Section 2 of article 11 of the Constitution is as follows:

"Sec. 2. Permanent School Fund. All proceeds of the sale of public lands that have heretofore been or may be hereafter given by the United States for the use and benefit of the common schools of this state, all such per centum as may be granted by the United States on the sale of public lands, the sum of five million dollars appropriated to the state for the use and benefit of the common schools in lieu of sections 16 and 36, and other lands of the Indian Territory, the proceeds of all property that shall fall to the state by escheat, the proceeds of all gifts or donations to the state for common schools not otherwise appropriated by the terms of the gifts, and such other appropriations, gifts, or donations as shall be made by the Legislature for the benefit of the common schools, shall constitute the permanent school fund, the income from which shall be used for the maintenance of the common schools of the state. The principal shall be deemed a trust fund held by the state, and shall forever remain inviolate. It may be increased, but shall never be diminished. The state shall reimburse said permanent school fund for all losses thereof which may in any manner occur, and no portion of said fund shall be diverted for any other use or purpose."

Most clearly, under this decision, the interpretation made by the majority of the act and its effect is unconstitutional.

The case of the State of Nebraska v. George H. Reeder, 5 Neb. 203, so holds. That was an escheat case proper, a person dying without heirs. The court said:

"If Henry Hooper left no heirs at his death, then all his property, real and personal, immediately vested in the state; and by section three of an act entitled 'An Act to increase the school fund in Nebraska by penalties, forfeitures, fines, unclaimed fees and estates,' approved February 15, 1869, all the property immediately became and constituted a part of the general school fund of the state. And by the provisions of both the old and new Constitutions, all the funds belonging to the state for educational purposes shall be deemed trust funds held

by the state, and shall so remain forever inviolate and undiminished, and the interest and income arising therefrom shall be exclusively applied to support and maintain the common schools throughout the state.

"Therefore, if the property of Henry Hooper escheated to the state, the same by operation of law, immediately upon his death, became and constituted a part of the general school fund of the state; and, by authority of the Constitution, it must forever remain there inviolate; and the Legislature cannot by legislative enactment divert this fund to any other objects. The Constitution, in express terms, inhibits them from doing so; and, hence, the Act of February 15, 1875, is a mere nullity, and confers upon the trustees therein named no rights to or power over the estate of Henry Hooper. The writ of mandamus must be denied."

Tested by these decisions, the act, if applicable, would not authorize the clerk to do otherwise than pay the plaintiff the $7.75 belonging to him.

Several cases are cited in plaintiff's brief concerning legislative enactments about disposition of unclaimed bank deposits and unclaimed court deposits. An inspection of them shows that, in every instance, the enactments are express and not by inference in dealing with a situation similar to the one we have here. It will further show that a hearing of some kind is provided for. It will further show that in no instance was the right of recovery by the owner denied, or hindered. Some of the acts are held void because of violating contracts. The logic of all is that an interpretation as here placed by the Attorney General and followed by the majority opinion would render the act in conflict with the federal Constitution. The interpretation placed on the statute, it seems to me, is not warranted. If the interpretation is true, clearly the act most flagrantly violates the state Constitution, and is contrary to sections 6, 7, and 24 of article 2, of the Bill of Rights.

The opinion refers to "res adjudicata." Nothing in the plea or argument indicates anything of that kind. The Attorney General especially asserts that he is not claiming immunity from suit or a failure to make necessary parties, but does insist on the rule that to justify "mandamus" it must appear that the right "must be clear." He contended, however, that the statute automatically divested plaintiff of his $7.75 when he failed to call for it for twelve months, "upon final conclusion and disposition" of the case. The citations made by him, none apparently applying to a case of an attempt to pass title to the state of that which belongs to a private person, were of "dead claims," the deceased leaving no heirs.

An examination of the text of Corpus Juris, referred to in the majority opinion, is convincing that it establishes, as far as a general text could, the necessity of a hearing before unclaimed deposits can be condemned to the use of the state. Citations are given by the attorneys for plaintiff that appear to apply. The text of 12 Corpus Juris, 1219, is copied, as follows:

"Statutes conferring power on courts to regulate and to administer the estates of absentees, presumptively dead, are valid, where provision is made for giving proper notice of the proceeding and adequate safeguards are provided to protect the absentee's interests in case of his reappearance. Statutes of this character are void, however, where reasonable provision is not made for notice to such absentees, or for a proper inquiry as to the fact of death, or where the title of the absentee is divested before the lapse of a reasonable time after his disappearance."

Clapp v. Houg, 65 L. R. A. 757, a North Dakota case, is cited. Under it the act here in question would violate the 14th Amendment to the federal Constitution.

The case of State v. Security Saving Bank, 154 Pac. 1070, from California, is cited. The clear logic of the case is that the interpretation placed by the majority on the statute, if true, makes the statute violative of the federal Constitution.

The case of Cunnius v. Reading School Dist., 49 L. Ed. 1125, from the Supreme Court of the United States, is cited. Under its holding the interpretation of the majority would render the act void.

The case of State v. Security Union Bank, 199 Pac. 26, from California, is cited. It was very analogous to this case as regards subject-matter on unclaimed bank deposit. The statute there is treated as declaring a forfeiture. To save the constitutionality, it was necessary to deny the doctrine of spontaneous forfeiture or automatic escheat. Several more cases are cited in the original brief.

The plaintiff's reply brief more fully elaborates cases concerning unclaimed deposits. Cases from Nebraska, New Hampshire, Kentucky, Massachusetts, Montana, California, United States Supreme Court, and Pennsylvania, are cited, which in reasoning most clearly condemn the opinion of the majority, though apparently overlooked.

I believe the plaintiff is entitled to the $7.75. He has asked for it, and is entitled to it. See the 11th chapter of the Gospel

by St. Luke, verses 11 and 12. The question there asked, in my view, is fitting here. Perhaps the query contained in verses 9 and 10 of the eighth chapter of St. Matthew is better, by reason of brevity. In my view, no department of government should deprive plaintiff of his due. I therefore register this dissent.